UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re ) | Chapter 7 Proceedings |
| ) | |
| ROBERT JOHNSON and JEANETTE ) | Case No. 2-04-bk-8831-CGC |
| JOHNSON, ) | |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| 99 WESTCHESTER INVESTMENTS, ) | Adversary No. 04-1014 |
| L.P., a California Limited Partnership, ) | |
| ) | |
| Plaintiff, ) | UNDER ADVISEMENT RE: |
| ) | DISCHARGEABILITY TRIAL |
| v. ) | |
| ) | |
| ROBERT JOHNSON and JEANETTE ) | |
| JOHNSON, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

I.     INTRODUCTION

Before the Court is a dischargeability proceeding brought by 99 Westchester Investments, L.P. ("Plaintiff") against Debtors Robert ("Robert") and Jeanette ("Jeanette") Johnson ("Defendants"). Robert was an officer, director, and shareholder of Resort Rent A Car, Inc. ("Resort"), a car rental company closely held and operated by certain members of his family. Defendant Jeannette Johnson is his wife. Plaintiff 99 Westchester Investments, L.P. was the sole shareholder of, assignee of and successor in interest to TCL Incorporated, a company operating a car rental kiosk within the Los Angeles International Airport and another facility just off the airport's grounds ("LAX locations").

II.     FACTS

In approximately June, 2000, Plaintiff and Resort began negotiations on the sale of Plaintiff's LAX locations to Resort. In approximately October to November, 2000, Plaintiff and Resort executed an Assignment and Sale Agreement and an Asset Purchase Agreement transferring

Plaintiff's leasehold interest in the two LAX locations, along with all other operating assets, to Resort for $1.5 million. Resort issued two promissory notes to Plaintiff totaling $1.5 million, which were personally guaranteed by Resort's President Jerry Martin (Robert's uncle), its General Manager Steve Johnson (Robert's father) and Resort RAC Holdings, LLC. ("RAC"), which owned the property used by Resort in its operations. Neither Robert nor Jeanette executed personal guarantees.

Within a month of finalizing the sale, Resort filed bankruptcy. It never made any payments on the $1.5 million promissory notes, although Plaintiff had already relinquished control of its properties and ceased operating. As the Resort bankruptcy progressed, the business essentially became worthless due to the increasing unpaid lease payments.

This led, in 2003, to a lawsuit by Plaintiff in California against RAC, Jerry Martin, Steve Johnson, Robert, Bryan Johnson (Robert's brother), and Resort, alleging numerous causes of action for fraud, deceit, misrepresentation and failure to disclose material facts in connection with the failed sale. While that matter was pending, Robert and Jeannette filed for bankruptcy before this Court, staying the district court proceedings against them.[1] Thereafter, Plaintiff filed this adversary proceeding.

Plaintiff alleges four grounds upon which it asks that damages in excess $1.5 million be declared nondischargeable and four grounds upon which it asks that the Debtors' discharge be denied:

1. The debt was obtained by false pretenses, false representation, or actual fraud pursuant to 11 U.S.C. section 523(a)(2)(A);

2. The debt was obtained by reliance on a written statement regarding Debtor's, or an insider's, financial condition that was materially false and which Debtor caused to be made with the intent to deceive pursuant to 11 U.S.C. section 523(a)(2)(B);

3. The debt resulted from fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny pursuant to 11 U.S.C. section 523(a)(4);

---

[1] Judgments were issued in the California case against Steve Johnson and against Resort RAC Holdings, LLC. The court concluded that Steve Johnson breached the sales agreements, breached his personal guarantees, breached the implied covenant of good faith and fair dealing, and engaged in fraud and deceit.

4. The debt resulted from willful and malicious injury by Debtor to Plaintiff pursuant to 11 U.S.C. section 523(a)(6); and

5. Last, pursuant to 11 U.S.C. section 727(a)(2), (3), (4), and (5), Debtor engaged in wrongdoing in or in connection with his bankruptcy case and/or has failed to explain satisfactorily his loss of assets and the deficiency of his assets to meet his liabilities.

The essence of the complaint is that Defendant Robert Johnson had a fiduciary duty as an officer and director of Resort to disclose to Plaintiff information material to Resort's financial condition in negotiating and consummating the purchase of Plaintiff's business. A two day trial was held February 5th and 6th, 2007, after which the parties completed post-trial briefing and the matter was taken under advisement.

Trial established the following. Robert was a Vice President of Resort with specifically delineated responsibilities. From the testimony of several individuals at trial, including Robert himself, it is fair to say this title was more form than substance:

Q. And your title was vice president; is that correct?

A. Correct.

Q. And what were your responsibilities or area of responsibility as a vice president.

A. My areas of responsibilities [sic] were primarily running a location in Reno, Nevada until the last year of the company, at which point I was a liaison for my father and the managers of each location. The vice president was purely a title, not a functionality of my day-to-day.

Significant business decisions were made primarily by Resort's President Jerry Martin and General Manager Steve Johnson. At the time Resort began making overtures to purchase Plaintiff, Robert's job was managing Resort's fleet of cars among the various car rental locations, ensuring that each rental location had a sufficient stock of cars for its anticipated rental needs and facilitating the transfer of cars among the various locations to meet those needs. He was not responsible for acquiring new cars, whether by purchasing or leasing, or selling off old inventory. He had no responsibility for interacting with Resort's lenders. He had no responsibility registering or titling Resort's cars.

Robert's involvement in the negotiations to purchase Plaintiff's LAX locations was minimal at best. While he attended some meetings, his role was passive not only because he made it so, but also because more active participation was beyond the scope of his authority. While he knew Resort

was interested in expanding and was in discussions with Plaintiff about acquiring the two LAX locations, he testified, and the Court finds, that this deal was being negotiated by Jerry Martin. In fact, although he met Plaintiff's principal, Lloyd Rae, Jr., these meetings were nothing more than brief hellos. Robert denied, and the Court finds, that he never asked Mr. Martin or his father, Steve Johnson, about the terms of the agreement with Plaintiff. Although he recalled a special stockholders meeting in Denver, Colorado in October, 2000, to approve the purchase of Plaintiff's business, he could recall little to no actual discussion as to the terms of the deal itself. Defendant's testimony supports a finding that the meeting was primarily about visiting Resort's new Denver location and coincidentally provided a convenient opportunity to have the stockholders approve the purchase. While recalling that the purchase involved issuing two promissory notes totaling $1.5 million, Robert could not recall any other details of the purchase:

> Q. Do you recall whether the specific terms of the acquisition were discussed at this meeting?
>
> A. No.
>
> Q. You don't recall?
>
> A. I recall entrusting that Jerry would look out for my best interests and left it to him to negotiate that transaction.

In addition to a lack of knowledge of the terms of the sale, the Court finds that Robert lacked any real sense of Resort's financial condition at or around the time of the purchase of Plaintiff's assets. While he admitted seeing copies of the company's financial reports, he was not aware of Resort's reported earnings for the twelve months ending June 30, 1999, let alone the months leading up to the purchase of Plaintiff's business. He testified at his deposition in October, 2006, that he entrusted his "father and my uncle to monitor the actions and moneys of the company. If I had ever seen the financials, I wouldn't be able – intelligent enough to scrutinize them." Nonetheless, he did sign off on the promissory notes in his capacity as a member of RAC.

During the negotiations between Resort and Plaintiff, Resort provided a copy of its financial statements for the fiscal years ending June 20, 1999, and June 30, 2000, to the Los Angeles Department of Airports ("LADA") to gain the City's approval of the sale from Plaintiff to Resort. Robert denied, and the Court finds, that he had any knowledge of the report or that it was provided

to LADA or that he had any responsibility for preparing the report. By all accounts, this financial report was not accurate and painted a rosier picture of Resort's financial status than was true at the time.

In particular, at the time this financial statement was provided, Resort was in the midst of a dispute with Signature Automotive Group, Inc. ("SAG"), a company owned and run by Thomas Borzilleri. Under a Master Lease with SAG, Resort leased cars from SAG. As part of the leasing agreement, Resort normally titled the cars in both its and SAG's name. However, between 1998 and 2000, Resort titled a large number of cars in its name only and subsequently sold these cars without notifying, or paying, SAG. As a result, SAG claimed damages upwards of $10 million. Robert knew this dispute existed at the time Resort was negotiating with Plaintiff to buy Plaintiff's operations; however, the Court finds he did not have particular knowledge of the validity of Mr. Borzilleri's claims or the impact they may have on Resort's operations, although he did remember that there were some discussions between Resort and SAG about making Mr. Borzilleri a principal of Resort to resolve the dispute. At the time of negotiating the purchase of Plaintiff's two LAX operations, this dispute and the potential compromise with SAG were in full swing. Undisputably, none of this information was disclosed to Plaintiff or the LADA. Without knowledge of this dispute with SAG, and in apparent reliance on the representation that Resort was financially stable, Plaintiff went ahead with the sale of the two LAX locations to Resort. Soon thereafter, everything fell apart.

## III. ANALYSIS

### A. What Plaintiff Must Show

It is upon these facts that Plaintiff seeks to hold Robert and Jeannette liable for the $1.5 million it was to receive under the contract with Resort.

While this record, as well as the judgment entered in the California action, supports a finding that Resort wrongfully withheld information from Plaintiff to its damage, it is scant at best on the key issue of Robert's role in this fiasco. Two issues must be examined to address that issue: First, are Robert and Jeanette independently personally liable for the debt, and, second, are they liable to Plaintiff because of Robert's role in the corporation? The answer to each question is no.

**B.     No Independent Personal Liability**

Plaintiff argues that it sought personal guarantees from Robert and Jeannette Johnson. The problem is that no such personal guarantees were given. While Plaintiff alleges that early negotiations called for personal guarantees from all principals of Resort, it knowingly signed off on the sale agreements with personal guarantees only from Jerry Martin, Steve Johnson and RAC. Plaintiff's counsel himself prepared these sale documents containing personal guarantees from only Jerry Martin, Steve Johnson and RAC. If that was not good enough, Plaintiff should not have agreed to those terms. Although Plaintiff's position is that it was misled into accepting these three personal guarantees only, the record in no way lays the blame at the feet of Robert. The misrepresentation, if any, was alleged to have been made by Jerry Martin and/or Steve Johnson. While this may be additional fodder for Plaintiff's case against Jerry Martin and Steve Johnson, it has no bearing on these Defendants' liability. Defendant Robert Johnson testified that he had no knowledge that Plaintiff wanted him and his wife to personally guarantee the debt, and he denied anyone ever asking him to personally guarantee the debt. Plaintiff presented no evidence to the contrary and the Court so finds.

Basic hornbook law teaches us that the corporate form was created to provide corporate officers and directors the freedom to operate with limited exposure to personal liability for their corporate acts. While corporate officers and directors owe fiduciary duties to the corporation and its shareholders, they do not generally owe fiduciary duties to third parties unless they can be shown to have acted outside the scope of their authority, voluntarily assumed personal liability or have had personal liability imposed by statute. None of these exceptions were established at trial.

Plaintiff argues that Defendants owed it a fiduciary duty pursuant to the "trust fund doctrine," but Plaintiff misapplies the doctrine. The trust fund doctrine provides that "all the assets of a corporation, immediately on its becoming insolvent, exist for the benefit of all of its creditors and that thereafter no lien nor rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over another." *A.R. Teeters & Associates, Inc. v. Eastman Kodak Co.,* 172 Ariz. 324, 331, 836 P.2d 1034, 1041 (Ct. App. 1992). Plaintiff interprets this language to mean

that Robert, as an officer, director and shareholder or Resort, owed a fiduciary duty to Plaintiff as a creditor of Resort that was breached by failing to disclose the true nature of Resort's finances during the sale negotiations. This argument is inapplicable. Plaintiff was not a creditor of Resort's or Robert's at the time the alleged misdeeds occurred. Plaintiff was a third party attempting to negotiate the sale of its property to Resort. Plaintiff admittedly became a creditor later, after the sale agreement was negotiated, but by then the conduct giving rise to the underlying dischargeability claims had already occurred. No such duty had arisen, however, during the negotiations.

### C. No Vicarious Fraud Liability

Plaintiff's most apt theory is that Robert personally facilitated Resort's fraud, thereby rendering him liable under Section 523(a)(2)(A) and/or (B). This would be a viable claim if the facts supported it; the fact is that the do not. As noted above, Robert was a minor player in this drama; his knowledge, expertise and responsibilities were simply not congruent with the Resort/TCL transaction. It was, in colloquial terms, "above his pay grade." The fact that his name is Johnson is insufficient to change these basic facts.

### D. No Section 523(a)(4) or (6) Claims

A claim under Sections 523(a)(6) was alleged but not seriously pursued by Plaintiff; in addition to the abandonment of the claim, the Court finds no facts to support its further consideration.

Plaintiff's Section 523(a)(4) claim is dependent on the viability of its trust fund theory. The Court has already found, first, that the theory is inapplicable and, second, the proof that Robert committed the requisite acts is absent.

### E. No Section 727(a)(3) Liability

While the record could support a finding that Resort's records were inadequate under Section 727(a)(3), that finding could implicate Robert's discharge only if maintaining the records was within his zone of responsibility. As noted above, it was not. Therefore, this claim also fails.

## IV. CONCLUSION

For the foregoing reasons, judgment will be given to Defendants on all counts. Counsel for Debtor is to submit a form of judgment consistent with this decision for the Court's signature.

So ordered.

DATED: May 29, 2007

_____
CHARLES G. CASE II
United States Bankruptcy Judge

**COPY** of the foregoing mailed by the BNC and/or sent by auto-generated mail to:

Christopher R. Kaup
Jeffrey A. Sandell
Tiffany & Bosco, P.A.
Third Floor, Camelback Esplanade II
2525 E. Camelback Road
Phoenix, Arizona 85016-4237
Counsel for Plaintiff 99 Westchester Investments, L.P.

David J. Habib, Jr.
2835 Townsgate Road, Suite 102
Westlake Village, California 91361-3041
Counsel for Plaintiff 99 Westchester Investments, L.P.

David Allegrucci
Allegrucci Law Office, PLC
307 North Miller Road
Buckeye, Arizona 85326
Attorney for Defendants Robert and Jeannette Johnson

_____